UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/4/2023
```

------------------------------------------------------------ X
                                :
                                :

CRYSTAL ADAMS, *et al.,*                :
                      Plaintiffs,   :
                                :          **MEMORANDUM OPINION &**
           - against -        :               **ORDER**
                                :

DEVA CONCEPTS, LLC,          :
                                :          1:20-cv-9717-GHW
                    Defendant.   :
                                :
------------------------------------------------------------ X


------------------------------------------------------------ X
                                  :
                                  :

ALEXA BATES, *et al.,*              :
                      Plaintiffs,   :
                                  :
           - against -        :          1:20-cv-9056-GHW
                                  :

DEVA CONCEPTS, LLC,          :
                                :
                    Defendant.   :
                                :
------------------------------------------------------------ X

GREGORY H. WOODS, United States District Judge:

      This is a mass tort involving claims of 166 Plaintiffs complaining of hair loss and damage, among other symptoms, which Plaintiffs claim they have sustained from using Defendant's haircare products. Plaintiffs independently—without the agreement of Defendant—proposed that the parties and the Court structure bellwether trials in this case prior to the commencement of discovery, on the basis of limited information obtained via private mediation. Defendant argues that insufficient information is presently available to proceed with Plaintiffs' proposed staggered discovery process, which would be targeted solely at the categories of bellwether trials proposed by Plaintiffs. The Court agrees with Defendant that insufficient information is presently available to

determine, prior to the commencement of discovery, whether bellwether trials will be used to resolve the case and the structure of any such bellwether trials. As a result, plenary discovery must be conducted for now, pending later consideration of a possible bellwether trial process.

## I.      BACKGROUND

This case involves two related actions, *Bates et al. v. Dev A Concepts, LLC* ("*Bates*"), No. 20-cv-9056-GHW, and *Adams et al. v. Deva Concepts, LLC* ("*Adams*"), No. 20-cv-9717-GHW. Both actions were brought against Defendant Deva Concepts, LLC ("Deva"). *See* Second Amended Complaint, Dkt. No. 80 (the "*Bates* Complaint"), ¶ 1; Fourth Amended Complaint, Dkt. No. 81 (the "*Adams* Complaint"), ¶ 1. Deva, doing business as DevaCurl, "created, formulates, manufactures, markets, advertises and sells multiple hair care products designed for use by consumers with curly hair." *Bates* Complaint, ¶ 1; *see also Adams* Complaint, ¶ 118. In short, Plaintiffs allege that—contrary to Deva's assertions and advertising—Deva's products contain harsh ingredients, and that "normal usage of the DevaCurl products according to product instructions causes hair loss, excessive shedding, thinning, breakage, balding, scalp irritation, loss of curl pattern, and other similar negative results." *Bates* Complaint, ¶ 4; *see also Adams* Complaint, ¶¶ 140, 141.

Plaintiffs' theory of causation, in essence, is that (1) "use of the various [Defendant's] Products in combination[] is dangerous," and (2) "Defendant's instructions for use of the Products throughout the line is dangerous." *See* Dkt. Nos. 101 (*Bates*), 108 (*Adams*), at 10–11. This is because Defendant's products allegedly contain both (1) "insufficient cleansers to remove non-water soluble ingredients" and (2) a series of "allergens, sensitizers and irritants," the effects of which may worsen as more products are used and as more time passes. *See id.* at 10–12. Defendant disputes, among other things, this theory of causation and, in turn, Defendant's liability and damages. *See* Dkt. Nos. 102 (*Bates*), 109 (*Adams*), at 9.

A related class action in this litigation was successfully settled on a class-wide basis.  Dkt. Nos. 102 (*Bates*), 109 (*Adams*), at 5 (citing *In re Deva Concepts Prod. Liab. Litig.*, No. 1:20-CV-01234-GHW, 2022 WL 3716541, at *1 (S.D.N.Y. Jan. 3, 2022)).  The class action was mediated by former United States Magistrate Judge Diane M. Welsh (Ret.).  *See id.*  This Court issued its order granting final approval of that class settlement on January 3, 2022.  *See generally In re Deva Concepts Prod. Liab. Litig.*, 2022 WL 3716541.[1]  All 166 Plaintiffs in *Adams* and *Bates* were members of that class, such that this case consists only of those Plaintiffs who chose to opt out of class resolution in order to litigate their individual claims.  *See* Dkt. Nos. 102 (*Bates*), 109 (*Adams*), at 5, 19.

In 2021, the *Adams* and *Bates* parties informally exchanged information as part of a private mediation process conducted with Judge Welsh.  *See* Dkt. Nos. 101 (*Bates*), 108 (*Adams*), at 3–4; Dkt. Nos. 102 (*Bates*), 109 (*Adams*), at 4–5.  On June 30, 2023, Plaintiffs proposed utilizing this information to proceed with discovery in a bellwether process so "as to facilitate the resolution of issues common to all Plaintiffs."  *See* Preconference Statement, Dkt. Nos. 98 (*Bates*), 99 (*Adams*), at 2.  Plaintiffs proposed focusing initial discovery "on issues common to all or substantially all Plaintiffs, followed by, if necessary, mini [i.e., bellwether] trials with groupings of 6–9 Plaintiffs."  *Id.*  They proposed "us[ing] the evaluation critical information already produced for each Plaintiff [during the private mediation process] to select Bellwether participants," with the twin goals of "precipitating and guiding settlement" and "allow[ing] the Parties to discreetly address the hotly contested issue of general causation (i.e., whether the [defendant's] Products can cause hair loss, hair damage and/or scalp and skin infections, rash and irritation), before turning to . . . extensive Plaintiff-specific discovery."  *Id.*

---

[1] Similar to the allegations in *Adams* and *Bates*, the class action settlement "involve[d] allegations in Plaintiffs' Consolidated Class Action Complaint that Defendant designed, formulated, manufactured, distributed and sold haircare products that [were] falsely and misleadingly labeled and sold as well as caused adverse reactions resulting in personal injures to Plaintiffs and the Class."  *Id.* at *1.

3

Plaintiffs made this request to proceed with a bellwether process independently, and not jointly with Defendant.  The Court now considers whether proceeding with a bellwether process— at the request of Plaintiffs, when Defendant asserts it is not ready to do so—is appropriate, prior to the commencement of discovery and with limited information from a private mediation alone.

On July 19, 2023, the Court directed the parties to brief this issue of "whether the Court can and should determine prior to the commencement of discovery that bellwether trials will be used to resolve the case and the structure of such bellwether trials."  Dkt. Nos. 99 (*Bates*), 102 (*Adams*).  On August 8, 2023, Plaintiffs submitted their brief in support of a staggered, bellwether-oriented discovery approach, Dkt. Nos. 101 (*Bates*), 108 (*Adams*) ("Plaintiffs' Brief"[2]); and Defendant submitted its brief in support of a plenary discovery approach, pending later consideration of a possible bellwether trial process, Dkt. Nos. 102 (*Bates*), 109 (*Adams*) ("Defendant's Brief").  On August 25, 2023, Plaintiffs filed their reply, Dkt. Nos. 104 (*Bates*), 111 (*Adams*) ("Plaintiffs' Reply"); and Defendant filed its reply, Dkt. Nos. 105 (*Bates*), 112 (*Adams*) ("Defendant's Reply").

Plaintiffs argue for conducting staggered, bellwether-focused discovery now because of bellwether trials' potential to address the following common issues in this litigation:  (1) "general causation (i.e., can the [defendant's] Products cause the injuries Plaintiffs purport to have suffered);" and (2) "assuming liability arguendo, the value of Plaintiffs' non-economic injuries (i.e., pain and suffering, disfigurement, mental anguish, etc.)."  Plaintiffs' Brief at 2–3.  Defendant advocates for conducting plenary discovery, pending later consideration of a possible bellwether trial process, arguing that insufficient information is presently available by which to ascertain which bellwether plaintiffs are indeed "representative" of different categories of claimants.  Defendant's Brief at 7.

---

[2] This brief was submitted in identical form in both cases.  *See* Dkt. Nos. 101 (*Bates*), 108 (*Adams*).  The same goes for Defendant's Brief, Plaintiffs' Reply, and Defendant's Reply, all of which were submitted identically and simultaneously on the *Bates* and *Adams* dockets, respectively.  Each respective docket number is cited herein for reference purposes, though the documents are the same.

## II.        PURPOSE & AIM OF BELLWETHER TRIALS

### A.        In General

Federal courts are authorized to conduct bellwether trials in accordance with Federal Rule of

Procedure 42(b).  *See In re Methyl Tertiary Butyl Ether Prod.*, No. 1:00-1898, 2007 WL 1791258, at *1

(S.D.N.Y. June 15, 2007).  Bellwether trials aspire to provide a series of plaintiffs with relief "in a

timely and efficient manner."  *Id.* at *2.  They enable courts and juries "to give the major arguments

of both parties due consideration without facing the daunting prospect of resolving every issue in

every action."  *Id.*  The goal of a bellwether trial is to "produc[e] reliable information about other

cases centralized in [the] proceeding," with an eye toward "enhancing prospects of settlement or . . .

resolving common issues or claims."  MELISSA J. WHITNEY, BELLWETHER TRIALS IN MDL

PROCEEDINGS 3 (Fed. Jud. Ctr. 2019).  In this way, bellwether trials serve, first, as "informative

indicators of future trends" and, second, as "catalysts for an ultimate resolution."  Eldon E. Fallon,

Jeremy T. Grabill & Richard Pitard Wynne, *Bellwether Trials in Multidistrict Litigation*, 82 TULANE L.

REV. 2323, 2343 (2008).

For bellwether trials to fulfill their purpose, the selected plaintiffs and their claims "should

be representative of the range of cases" in the mass tort.  *See* MANUAL FOR COMPLEX LITIGATION

(Fourth) (the "Manual") § 22.315 (Fed. Jud. Ctr. 2004).  As the Manual clarifies:

> Test cases should produce a sufficient number of representative verdicts and settlements to
> enable the parties and the court to determine the nature and strength of the claims, whether
> they can be fairly developed and litigated on a group basis, and what range of values the
> cases may have if resolution is attempted on a group basis.  The more representative the test
> cases, the more reliable the information about similar cases will be.

*Id.*  "If bellwether cases are representative of the broader range of cases in the . . . proceeding, they

can provide the parties and [the] court with information on the strengths and weaknesses of various

claims and defenses and the settlement value of cases."  Whitney, at 3–4; *see also In re Chevron U.S.A.,*

*Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997) ("A bellwether trial designed to achieve its value

5

ascertainment function for settlement purposes or to answer troubling causation or liability issues

common to the universe of claimants has as a core element representativeness.").

     Identifying representative plaintiffs for bellwether trials is generally a three-step process.

According to Professors Fallon, Grabill, and Wynne:

> First, the . . . court should catalogue the entire universe of cases that comprise the [litigation]
> and attempt to divide the cases into several discrete categories based on prominent variables.
> Second, the . . . court should create a pool of representative cases, which includes cases from
> each category, and then place these cases on a fast-track for case-specific discovery.  Third,
> the . . . court must devise the appropriate methodology for selecting a predetermined
> number of individual cases from the pool for trial.

Fallon et al., at 2325–26.

     In identifying representative cases, courts may "identify[] key variables that will allow for

categorization of cases into major subsets or groups.  Such variables may include plaintiff or

defendant characteristics, the type of injury, the claims brought, the time when claims arose or a case

was filed, or the availability of certain defenses." Whitney, at 19.  The test cases should, first,

"accurately reflect the individual categories of cases that comprise the [litigation] in toto," second,

"illustrate the likelihood of success and measure of damages within each respective category," and

third, "illuminate the forensic and practical challenges of presenting certain types of cases to a jury."

Fallon et al., at 2343.  Importantly, "[a]ny trial-selection process that strays from this path will likely

resolve only a few independent cases and have a limited global impact." *Id.*  Thus, courts should

proceed with a bellwether process only when they have sufficient information to appropriately

identify the categories of cases through which a bellwether trial process could meaningfully proceed.

     Courts should be wary of premature decision-making regarding the bellwether process:  "a

case that appears to be favorable or representative early in the litigation process (when the pool is

initially filled) may be eventually determined to be unrepresentative or grossly unfavorable once

case-specific discovery is complete." *Id.* at 2347.  To avoid outcomes like this, which undercut the

purpose of bellwether trials, courts should take care to avoid choosing "representative plaintiffs for

bellwether discovery . . . in a vacuum . . . ." *Meranus v. Gangel*, No. 85 CIV. 9313(WK), 1991 WL
120484, at *1 (S.D.N.Y. June 26, 1991).  "Choosing an appropriate sampling technique will depend
upon the extent to which the plaintiffs differ from one another with respect to characteristics
relevant to this litigation." *Id.*  Thus, to decide whether to use bellwether trials and what their
structure would be, the Court requires sufficient information to "identif[y] . . . the pertinent
characteristics and categorization of the plaintiffs," as different "clusters of plaintiffs may have
different attributes." *Id.*  Plaintiffs advocating for a bellwether process should advance a "basis for
the selection of the specific bellwether cases; . . . articulate[] what issues might be decided
preclusively on the basis of the bellwether cases; and . . . explain[] how proceeding in stages will
produce efficiencies rather than delay."[3] *Zito v. Leasecomm Corp.*, 233 F.R.D. 395, 399 (S.D.N.Y.
2006) (stating that the foregoing was lacking from the plaintiffs in this case, suggesting that the court
would have proceeded with a bellwether-oriented discovery process had the plaintiffs availed the
court of this information).

    **B.**    **As Applied**

        The Second Circuit has not clarified what factors district courts should weigh in considering
whether to conduct plenary discovery or proceed to staggered discovery in the context of an
anticipated or possible bellwether trial process.  For these reasons, the Court is guided in its decision
by a review of these first principles of bellwether trials, the limited caselaw, the parties' arguments,
the proposed bellwether categories, and the information exchanged to date.  From this review, the
Court finds that there is not sufficient information at this time—prior to the commencement of
discovery—to proceed with a staggered discovery process targeted solely at the categories of

---

[3] To clarify, in a bellwether process, "'the outcome of the trial is binding only as to the parties involved in the trial itself.
The results of the trial are used in the other cases purely for informational purposes as an aid to settlement.'" *Sitts v.
Dairy Farmers of Am., Inc.*, No. 2:16-CV-287, 2020 WL 2092719, at *3 (D. Vt. May 1, 2020) (quoting *Dunson v. Cordis
Corp.*, 854 F.3d 551, 555 (9th Cir. 2017).  Bellwether processes do not necessarily invoke issue preclusion.

bellwether trials proposed by Plaintiffs.  Specifically, the Court lacks sufficient information to ascertain representative categories of claimants in this litigation.  As a result, the structure of any potential bellwether trials remains uncertain; the case must proceed with plenary discovery for now.

### 1.    Plaintiffs' Proposal:  Categories & Information

Plaintiffs propose six categories of cases to be tried under a bellwether process—ranging from category 1(a), "Plaintiffs who have primarily suffered scalp and skin irritation, infection, rash or itchiness with no or modest hair loss and/or damage," to category 3(b), "Plaintiffs who have suffered baldness, complete loss of hair in more than three areas or any single spot of balding larger than 1 inch in diameter."  Plaintiffs' Brief at 3.[4]  Their six categories turn upon, in essence, the degree of hair loss experienced by Plaintiffs.  They claim that sufficient information is available to select bellwether trial plaintiffs into these six categories, citing to the "Evaluation Critical Information" that Plaintiffs provided in or around 2020 or 2021, in connection with the 2021 mediation.[5]  *Id.* at 3–4.  Plaintiffs argue that this "is essentially the same information [they] would expect to be requested through formal discovery . . . ."  *Id.* at 4.

---

[4] For the reader's context, the four intermediate categories Plaintiffs propose are 1(b), "Plaintiffs who have suffered mild diffuse hair loss (approximately 25% or less total volume) with or without attendant skin irritation, infection, rash or itchiness and/or damage;" 2(a), "Plaintiffs who have suffered moderate diffuse hair loss (approximately 26% to 39% total volume) with or without attendant skin irritation, infection, rash or itchiness and/or damage;" 2(b), "Plaintiffs who have suffered severe diffuse hair loss (approximately 40% or more total volume) with or without attendant skin irritation, infection, rash or itchiness and/or damage;" and 3(a), "Plaintiffs who have suffered balding (complete hair loss) in one to three areas of the scalp with or without attendant skin irritation, infection, rash or itchiness and/or damage."  *Id.*

[5] This "Evaluation Critical Information" includes:

> (1) sworn Questionnaires providing information concerning the name(s) of the Products used and time frame for usage; the onset of injuries; medical, medications and emotional history; and hair treatment and styling . . . ; (2) before and after photos; (3) sworn witness statements . . . ; (4) itemized and verified economic damage documentation . . . ; (5) videos in which Plaintiffs explain . . . the reasons for purchasing the Products, when and how they used the Products, when and what injuries they suffered, how the injuries have impacted them, and the damages they seek; and (6) authorizations for medical records for a time period of two (2) years prior to each Plaintiff's use of the Products to present [i.e., at the time of the mediation] for treatment received from [certain] types of health care providers . . . .

*Id.* at 4.

### 2.    Defendant's Response:  The Proposal's Limitations

Defendant argues that the Evaluation Critical Information is insufficient because it is (1) "several years old," (2) lacking in "key information of liability, causation and damages," and (3) "not verified."  Defendant's Brief at 9.  Defendant proposes that, prior to making any decision on whether a bellwether process is appropriate, Plaintiffs should first "be required to (i) provide adequate, verified responses to Defendant['s] written discovery requests; (ii) produce responsive documents; and (iii) provide updated medical authorizations and have their relevant medical records collected."  *Id.* at 1.  Defendant asserts that "Plaintiffs have served only general, global responses to DevaCurl's written discovery," and that "Plaintiffs in *Bates* have not produced any documents" or any "verified response[s] to interrogatories."  *Id.* at 9.

Defendant also contends that, at the time of filing their brief in early August 2023, only one *Adams* Plaintiff had produced documents, and only 16 of the 106 *Adams* Plaintiffs "provided some form of an individual response to interrogatories."  *Id.*  Defendant added that "the 16 *Adams* Plaintiffs that provided individual responses to DevaCurl's interrogatories did not respond to each interrogatory as written by DevaCurl," instead "respond[ing] to a condensed, paraphrased survey created by their counsel," which Defendant argues violates F.R.C.P. 33(b)(3).  *Id.* at n.5.  Defendant claims that it is missing information regarding "(1) which of the 40 at-issue products Plaintiffs used and when; (2) dose and duration of use; and (3) relevant medical history for each Plaintiff, among many other variables."  *Id.* at 10.

Plaintiffs reply that at least some of the information is sworn—namely, the economic damages forms and witness statements for the *Adams* Plaintiffs—and "it is Plaintiffs' understanding" that healthcare providers verified Plaintiffs' medical records as well.  Plaintiffs' Reply at 8.  The *Adams* Plaintiffs, additionally, state that they have served verified responses to Defendant's first set of written discovery (interrogatories and requests for production), for at least the vast majority of

the *Adams* Plaintiffs, though the *Bates* Plaintiffs appear to remain in the process of doing so. Plaintiffs' Reply at 8.  By letter dated August 31, 2023, counsel for the *Adams* Plaintiffs averred that "defense counsel has access to interrogatory responses for all but thirteen . . . of 106 [*Adams*] Plaintiffs," and that Plaintiffs' counsel is "working in haste" to produce the remainder of the *Adams* Plaintiffs' interrogatory responses.  *See* Letter from Plaintiffs' Counsel, Dkt. No. 114 (*Adams*). [6]

### 3.    The Proposal is Premature

Given the underlying purposes and goals animating bellwether trials, and the state of information as it currently stands between the parties, plenary discovery must be conducted pending later consideration of a possible bellwether trial process.

Current information is insufficient to identify either representative categories of claimants, or representative test cases within those categories.  For bellwether trials to serve as effective "information indicators" or to produce reliable information, their test cases must be representative. *See* Fallon et al., at 2343; Whitney, at 3; Manual § 22.315.  Representative cases should be able to answer, for example, "troubling causation or liability issues common to the universe of claimants." *In re Chevron*, 109 F.3d at 1019.  Addressing these questions requires sufficient information on variables such as the "plaintiff[s'] . . . characteristics, the type of injury, the claims brought, the time when claims arose or a case was filed, or the availability of certain defenses."  Whitney, at 19.

Here, the Court is unable to confidently "divide the cases into several discrete categories based on prominent variables" given the information presently available.  *See* Fallon et al., at 2325–26.  That is, the Evaluation Critical Information exchanged in connection with the private mediation proceedings is insufficient to allow the Court to select representative bellwether trials.  It is lacking in both quantity and quality.

---

[6] There was no analogous letter filed in *Bates*.

a.      **Quantity of Information**

First, information presently available is insufficient in its quantity, level of detail, and nuance, especially given Plaintiffs' proposed categories of claimants.  Plaintiffs' proposed categories purport to illuminate the common issues of (1) "general causation (i.e., can the [defendant's] Products cause the injuries Plaintiffs purport to have suffered)" and (2) "the value of Plaintiffs' non-economic injuries."  Plaintiffs' Brief at 2–3.  But Plaintiffs have failed to articulate a cognizable basis for how their proposed six categories are indeed representative of the full set of cases in this litigation— especially given those purported common issues.  Plaintiffs propose categorizing the 166 total Plaintiffs based on, primarily, degree of hair loss.  *See id.* at 3; Defendant's Brief at 19 (noting that "there are currently 166 Plaintiffs").  Assuming that it is possible to divide all 166 Plaintiffs in this manner based on the quality of information presently available, Plaintiffs' proposed categorization might provide helpful insights regarding the value of any injuries for *damages* purposes.  But the Court lacks sufficient information to determine whether these categories adequately enable the parties and the Court to assess the *general causation* question, especially given the number of credible variables that Defendant contends may impact Plaintiffs' theory of causation.

That is, Plaintiffs' proposed categories do not adequately enable Defendant to test some of its key arguments regarding potential alternative causes of Plaintiffs' injuries—for example, Plaintiffs' use of other products (not Defendant's) and Plaintiffs' medical histories.  On the first argument, Plaintiffs allegedly varied in their use of Defendant's own products, and some may have simultaneously "used haircare products from other brands, received chemical treatments, dyed their hair, and/or used [high-heat] styling tools," all of which may plausibly contribute to the causation inquiry regarding Plaintiffs' hair loss or damage.  *See* Defendant's Brief at 11.  On the second argument, Defendant points to numerous potential common causes of hair loss—some of which are hereditary; others, related to major life events, stress, diet, medication use, etc.  *See id.* at 13–15

(noting that hair loss, to some degree, is a common life event).  Some of the more serious potential causation issues in the case relate to these potential fact patterns and arguments, none of which are adequately captured by Plaintiffs' proposed, purportedly "representative" categorization of Plaintiffs and their claims.

To meaningfully test these alternative theories of causation, Defendant must be allowed an opportunity to collect nuanced information to support its credible arguments.  For example, on the variation-of-products argument, it is not enough that Defendant knows merely "the name(s) of the Products used and time frame for usage; . . . hair treatment and styling . . . [and] when and how [Plaintiffs] used the Products."  *See* Plaintiffs' Brief at 4.  Rather, Defendant must be given the opportunity to collect further details regarding Plaintiffs' product use, to better inform the potential categorization of bellwether claimants and to effectively test this argument.  The present information, for example, does not appear to make clear which products Plaintiffs used *besides* those of the defendant—which may be, of course, highly relevant to the causation inquiry.  Defendant is likewise entitled to conduct some discovery regarding Plaintiffs' individual medical histories.  A full picture of these histories may enable the parties and the Court to, at a later date, draw up more representative categories of claimants, should the Court decide to proceed with a bellwether process.  For example, claimants of a sizable number might share similar medical histories that purport to offer a plausible alternative theory of causation for the hair loss or damage, at least as to that category of claimants.  If so, building a bellwether category on that basis may be a more useful information indicator than building groups based off Plaintiffs' degree of hair loss alone.

Thus, Plaintiffs' proposed bellwether structure is unlikely to "provide the parties and [the] court with information on the strengths and weaknesses of various claims and defenses and the settlement value of cases."  Whitney, at 3–4.  It cannot do so given the dearth of information presently available to determine meaningful, representative groupings of claimants.  In identifying

pertinent variables at play in this litigation, the parties and the Court need a fuller understanding of the variety of potential alternative causes of Plaintiffs' injuries; this information will also give Defendant a fair and adequate opportunity to develop any of its arguments opposing Plaintiffs' theory of general causation. Plaintiffs' proposal therefore fails to promote the bellwether process's goal of meaningfully "illuminat[ing] the forensic and practical challenges" of litigating the complicated issues and causal theories presented in this case. *See* Fallon et al., at 2343.

### b.    Quality of Information

Second, the quality of extant information is questionable, given how much of it is either unverified or dubiously verified. Courts should not attempt to divine representative categories and cases, for bellwether purposes, on the basis of unreliable information; prematurely selected cases "may be eventually determined to be unrepresentative or grossly unfavorable once case-specific discovery is complete." *See* Fallon et al., at 2347. This Court declines the invitation to proceed on the basis of overly simplistic and potentially unreliable information, which could produce categories of claimants that are not in fact representative of the universe of claims—defeating the purpose of bellwether trials.

At present, it appears that the *Bates* Plaintiffs have not submitted any responses to Defendant's first set of written discovery, and it is unclear whether the *Adams* Plaintiffs have completed serving their responses either. Of the information that is available, according to Defendant, "the 16 *Adams* Plaintiffs that provided individual responses to DevaCurl's interrogatories did not respond to each interrogatory as written by DevaCurl," instead "respond[ing] to a condensed, paraphrased survey created by their counsel." Defendant's Brief at 9. Defendant claims that it is missing verified information regarding "(1) which of the 40 at-issue products Plaintiffs used and when; (2) dose and duration of use; and (3) relevant medical history for each Plaintiff, among many other variables." *Id.* at 10. For example, Defendant lacks information—newer than that

provided in connection with the 2021 mediation—as to whether "Plaintiffs' hair/scalp issues

improved since discontinuing [use] of the product," which may be relevant to the causation inquiry.

Defendant's Reply at 5.  Lacking critical information pertaining to the defense's major arguments on

the key issue of causation, Defendant argues, "will not expedite resolution," but instead "delay it."

*Id.* at 6.

      The Court agrees with Defendant:  bellwether-oriented discovery cannot be conducted until

the Court is able to confidently identify the pool of representative cases building the relevant

categories for any potential bellwether process.  *See* Fallon et al., at 2325–26.  The Court is uncertain

that the six categories Plaintiffs have identified accurately "comprise the [litigation] in toto," nor is

the Court confident that picking cases now, based on the information currently available, will

meaningfully reveal "the likelihood of success and measure of damages within each respective

category" chosen by Plaintiffs in their proposal.  *See id.* at 2343.  Because the Court cannot choose

"representative plaintiffs for bellwether discovery . . . in a vacuum," *Meranus*, 1991 WL 120484, at \*1,

plenary discovery must be conducted before, if at all, proceeding to the staggered, bellwether-centric

approach suggested by Plaintiffs.  Proceeding prematurely now would produce only inefficiencies

and delay.  *See Zito*, 233 F.R.D. at 399.

      Rather than supporting Plaintiffs' argument, the key case upon which Plaintiffs rely

illustrates the problem.  Typically, both parties agree that a bellwether process is proper, and the

parties work together to identify the scope of targeted discovery with this end in mind.  *See, e.g.*,

*Collazo v. WEN by Chaz Dean, Inc.*, No. 215CV01974ODWAGR, 2018 WL 3424957, at \*1 (C.D. Cal.

July 12, 2018) (noting that, in that case, "the parties stipulated . . . that the cases are well-suited for

bellwether trials").  Here, Defendant proffers that it is operating in an information vacuum, and that

it is not able to discern what, exactly, the appropriate bellwether cases or categories would be to

meaningfully test its arguments rebutting Plaintiffs' causal theory.  If even the defendant cannot

discern the appropriate, representative bellwether categories with the information presently available, it is clear that the Court cannot do so, given its substantially more limited familiarity with the underlying facts at this stage of the case. Far unlike the situation in *Collazo*, where the parties came to an agreement on both the fact and structure of bellwether trials, Plaintiffs here ask the Court to force Defendant to engage in a bellwether process. Plaintiffs make this request absent sufficient information that would support either the initial decision to do so, or the structure through which to implement any such trials. Plaintiffs have failed to identify a single case where a court is asked by one party to force its opponent to participate in a bellwether process in these circumstances.

Moreover, Plaintiffs attack Defendant's motivations of advocating plenary discovery "as a [d]efense [s]trategy, [n]ot a [l]itigation [t]ool." *See* Plaintiffs' Brief at 6. But Defendant is correct that the parties, and the Court, will need "to flesh out the plaintiffs who are serious about pursuing a claim" before proceeding to any eventual bellwether process. *Id.* at 7 (quoting defense counsel's remarks at the July 19, 2023 conference). Identifying representative Plaintiffs entails obtaining sufficient knowledge about the "range of values" in the pool of 166 Plaintiffs writ large, as well as obtaining targeted discovery as to any selected bellwether Plaintiffs. *See* Manual § 22.315. The parties and the Court cannot pick representative Plaintiffs when they lack information regarding, among other things, which specific Plaintiffs are willing to participate fully in the discovery process.

It may indeed be the case that some Plaintiffs "drop out" as a result of the discovery process. Plaintiffs' Brief at 7 (quoting defense counsel's comments at the July 19, 2023 conference). However, as Defendant rightly acknowledges, "Plaintiffs had the opportunity to avoid [the full discovery] process by joining in the [related] class action." Defendant's Reply at 1. The *Bates* and *Adams* Plaintiffs chose to opt out and to litigate their claims individually. Since each Plaintiff chose to litigate their case individually here, rather than accepting the class-wide resolution, the Court is

not persuaded by the complaint that the litigation imposes some burden on Plaintiffs: it is the burden they elected.

## III.     CONCLUSION

Therefore, plenary discovery must be conducted for now, pending later consideration of a possible bellwether trial process. It may turn out, over the course of discovery, that further limitations on discovery are warranted. The Court takes no position in this order regarding whether bellwether trials will ultimately be appropriate in this case. Nor does the Court take any position regarding when the time may be to develop a bellwether process. All the Court holds now is that insufficient information is presently available to determine, prior to the commencement of discovery, whether bellwether trials will be used to resolve the case and the structure of any such bellwether trials.

SO ORDERED.

Dated:  October 4, 2023

_____
GREGORY H. WOODS
United States District Judge